**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

ZHENMEI LIU,                          §
*Plaintiff*                           §
                                      §
                                      §
v.                                    §        Case No.  SA-23-CA-01230-XR
                                      §
KCI  USA,  INC.,    3M  COMPANY,      §
ACELITY HOLDINGS, INC.,               §
*Defendants*                          §

## ORDER GRANTING SUMMARY JUDGMENT

On this date, the Court considered Defendants 3M Company, KCI USA, Inc., and Acelity,

Inc.'s Motion for Summary Judgment (ECF No. 32) and the associated filings (ECF Nos. 37, 41–

42, 44).   After careful consideration, the Motion for Summary Judgment (ECF No. 32) is

**GRANTED**, and this case is **DISMISSED.**

### BACKGROUND[1]

Plaintiff Zhenmei Liu began working at KCI in October 2006, as a Senior Biostatistician.

ECF No. 32-4 at 3.   KCI manufactured medical devices, particularly related to wound care.  *Id.*

Liu worked with a team on the design, conduct, and analysis of clinical trials for KCI's products.

*Id.*

In 2017, Liu began reporting to Senior Manager Yeni Nieves, who in turn reported to

Senior Director (later, Vice President) of Global Clinical Affairs Jane Hart.  *Id.*  In June 2018, Liu

---

[1] Because this case is at the summary judgment stage, the Court views "facts that are subject to genuine dispute . . . in the light most favorable to" the nonmovant.  *Taylor v. Riojas*, 592 U.S. 7, 8 n.1 (2020).

Both parties object to certain summary judgment evidence.  Liu objects to the declaration of Jane Hart.  *See* ECF No. 45–50.   But her objections are essentially that the declaration is factually inaccurate.  *See id.*   A factual disagreement does not render summary judgment evidence incompetent.

Defendants, for their part, provide about seventy-five pages of objections to Liu's declaration and other exhibits.  *See* ECF No. 44.   The Court need not address these objections, because it grants the Motion regardless.

received a raise.  ECF No. 32-4 at 23.  At some point before receiving that raise, Liu was promoted to the position of Global Lead Statistician.[2]

## I.    Liu's Employment Evaluations

Employees at KCI, including Liu, were subject to quarterly and year-end performance reviews.  ECF No. 32-4 at 4; ECF No. 32-4 14–21, 26–50.  In those reviews, both the manager and the employee provided comments on the employee's performance related to specific objectives.  *See* ECF No. 32-4 at 14–21, 26–50.  For each objective, the employee and manager also each provided a "rating," such as "Achieves Results Well Beyond Expectations," "Consistently Achieves Results," "Meets Some But Not All Expectations," or "Does Not Meet Expectations."  *See id.*  The year-end reviews included an overall numerical rating, corresponding to an overall qualitative rating like those for each objective.  *See* ECF No. 32-4 at 14, 34.

In Liu's 2017 year-end performance review, Nieves gave Liu consistently high ratings.  Liu's overall numerical rating was 4.31, meaning she "Achieves Results Well Beyond Expectations."  ECF No. 32-4 at 14.  The evaluation listed three objectives, and Liu received high ratings on all of them.  ECF No. 32-4 at 14–19.  Throughout the rest of her time at KCI, Liu received similarly good evaluations and feedback on some objectives.  *See, e.g.*, ECF No. 32-4 at 27, 39, 44.  And as late as April 2019, Liu received commendations separate from her formal evaluations for certain aspects of her work.  *See* ECF No. 37-2 at 2, 139.

But starting in 2018, Liu's performance reviews became less consistently positive.  *See* ECF No. 32-4 at 14–21, 26–50.  In her third-quarter 2018 evaluation, for example, she received a

---

[2] Defendants assert that Liu became Global Lead Statistician when she received the raise in June 2018.  ECF No. 32-2 at 3.  But in her deposition, Liu testified that she had that title before receiving the raise and, in fact, before Nieves began working at KCI.  ECF No. 32-3 at 11.  Liu's 2017 performance review lists her job title as "Global Lead Statistician," providing further evidence that she received the title before June 2018.  ECF No. 32-4.

rating of "Meets Some But Not All Expectations" on her only completed objective.  *See* ECF No. 32-4 at 30–32.  And in her 2018 year-end evaluation, her overall numerical rating was 3.07, meaning she "Consistently Achieves Results."  ECF No. 32-4 at 34.  Her objective-by-objective ratings were similarly less consistent than before.  *See* ECF No. 32-4 at 34–41.  And Liu's own "calculated rating" of her work decreased from 4.77 in 2017 to 3.79 in 2018.  *See* ECF No. 32-4 at 14, 34.

Liu's 2019 evaluations followed a similar pattern.  *See* ECF No. 34-2 at 43–50.  In her final evaluation—for the second quarter of 2019—she had three objectives.  *See* ECF No. 34-2 at 47–50.  On two, Nieves gave her a rating of "Meets Some But Not All Expectations."  *See id.*  On the third, her rating was "Does Not Meet Expectations."  ECF No. 34-2 at 48.

## II.    Performance Improvement Plan and Termination

On August 28, 2019, about two months after Liu's second-quarter 2019 evaluation, *see* ECF No. 32-4 at 47, Nieves provided Liu a "Performance Improvement Plan" ("PIP").  ECF No. 32-4 at 52–55.  Therein, Nieves identified certain areas in which Liu was allegedly not meeting expectations, along with descriptions and examples of the alleged performance deficiencies.  *See id.*  The PIP also included "expected goals" and established a sixty-day "improvement period." *See id.*  It specified that "KCI reserve[d] the right to terminate the [PIP] and terminate [Liu's] employment at any time during/after the PIP."  ECF No. 32-4 at 55.

On September 24, 2019, Nieves met with Liu again to review an updated version of the PIP.  *See* ECF No. 32-4 at 57.  The updated PIP indicated that Liu had demonstrated minimal or no improvement on each of the original PIP's "expected goals."  *See* ECF No. 32-4 at 59–62.  Liu did not want to sign the updated PIP because she did not think it was accurate.  ECF No. 32-3 at 17.  But Nieves told her that if she did not sign, she could not leave the office.  *Id.*  So Liu signed

the document but indicated—including by writing on the updated PIP—that she disagreed with Nieves's assessment. ECF No. 32-3 at 18; ECF No. 32-4 at 59–62.

After reviewing either the initial or the updated PIP with Liu, Nieves told Liu to resign or be demoted. ECF No. 32-3 at 13. Liu responded that she saw no reason to be demoted and that she would not resign. *Id.*

On October 1, 2019, KCI terminated Liu. ECF No. 32-4 at 4. According to KCI, it terminated her because of (1) her "disagreement with every part of the follow-up PIP" and (2) "her minimal to no improvement shown." *Id.*

After Nieves told Liu she was fired, Liu gave Nieves a complaint she had written a few days prior. ECF No. 32-3 at 17.[3] In this complaint, Liu asserted that Nieves had retaliated against her based on an assumption that Liu was the author of an anonymous survey response critical of Nieves. *See* ECF No. 32-4 at 66. On October 3 and 7, 2019, Liu emailed KCI officials reiterating this assertion and arguing that Nieves had fabricated the complaints about Liu's work. *See* ECF No. 32-4 64–80.

### III.    Alleged Incidents of Discrimination

Liu points to several incidents she argues demonstrate that she was subject to discrimination at KCI based on her Chinese national origin.[4]

Liu heard coworkers at KCI direct the word "chinglish" towards her "many times." ECF No. 32-3 at 25. She identifies two specific occasions, both of which involved Nieves. On the first, Liu was meeting with Nieves one-on-one when Nieves allegedly got mad and said, "you

---

[3] Liu claims in her Response that she delivered the complaint *before* her termination. *See* ECF No. 37 at 35. But she points to no evidence of that, while Defendants point to Liu's own testimony that she gave the complaint to Nieves *after* she was fired. ECF No. 32-2 at 16–17.

[4] The relative timing of these events is not entirely clear.

chinglish." ECF No. 32-3 at 19. On the second, Nieves asked Liu to write something that Liu believed federal regulations prohibited her from writing. *Id.* Liu refused, and Nieves accused her of disobedience. *Id.* Liu responded that it was not really disobedience, because she could not do what Nieves asked her to. *Id.* In response, Nieves said, "you chinglish" and hung up the phone. *Id.* Further, on multiple occasions, Nieves told Liu "I don't understand what you're saying" in a way Liu interpreted as discriminatory and looking down on Liu. *Id.*

Nieves or Hart also informed Liu that she would have to move from her quiet, senior cubicle to what Liu called a "hallway desk." ECF No. 32-3 at 13–15, 19. Liu's senior cubicle was given to an entry-level, white statistician named Mark Camardo. ECF No. 32-3 at 13. Liu's new workspace was noisy, and there were quieter spaces available. *Id.* That said, Liu did not ask to move to one of those quieter spaces. ECF No. 32-3 at 14.

At another point, several employees were getting ready to go to lunch. The restaurant they were going to had a promotion, where a customer would be rewarded if they could finish a certain dish. ECF No. 32-3 at 23. A coworker named David had registered for the promotion. *Id.* Several employees, including Liu, were talking before heading to the restaurant, when Hart entered the room. *Id.* Hart asked Liu, "who will you cheer for? Your husband or David?" *Id.* Liu's husband—who is also of Chinese national origin—was not going to the lunch, as it was only for employees. *Id.* Liu interpreted Hart's comment to be about Liu and her husband's Chinese national origin. *Id.*

Next, Hart said in front of about thirty people at a meeting that Liu was "not doing [her] job," because some data was "not clean." ECF No. 32-3 at 21. Liu emphasized in her deposition that Hart raised her voice and seemed "very upset" when she made this comment. *Id.* And according to Liu, it was not her job to keep the data "clean." *Id.* It was the clinical department

and data management group's job. *Id.* Liu assisted those teams in keeping data clean by implementing certain tools to help identify inconsistencies, but asserted it was ultimately not her responsibility. *Id.* The head of the clinical department at the time was Anthony Tate, who is white. *Id.* At the time of the comment, Tate was in a position at Nieves's level. ECF No. 32-3 at 22. Shortly after, he was promoted. *Id.* In both roles, Tate reported directly to Hart. *Id.*

Liu also says that KCI passed up a more qualified Black statistician to hire a statistician of Chinese ethnicity, named Kaiyan Jing. ECF No 32-3 at 26. Liu believes that KCI hired Jing because of her ethnicity, to replace Liu. ECF No. 32-3 at 25–26.

Liu alleges that, throughout the relevant period, she had a higher workload than her peers. ECF No. 32-3 at 5. Her Response also vaguely refers to "intrusive 'time monitoring.'" ECF No. 37 at 33. The only evidence of this monitoring that she points to is one exhibit suggesting Nieves required her to provide "daily plans" during at least part of the PIP "improvement period." *See* ECF No. 37-2 at 23–25.

Liu also says that a coworker mocked her Christian faith by comparing her workplace struggles with Jesus's suffering, in an effort to trivialize her complaints. ECF No. 32-3 at 5.

Finally, Liu points to her termination date—October 1, which is a Chinese holiday. ECF No. 32-3 at 30. Liu had brought candies for her coworkers on October 1 in previous years, which she says suggests that Nieves was aware of the day's cultural significance. *Id.* Nonetheless, Nieves fired Liu on that day, which Liu characterizes as "ethnic mockery." *Id.*

## IV. Procedural History

In September 2023, Liu sued KCI; Acelity, which owned KCI at all relevant times; and 3M, which acquired Acelity and KCI shortly after Liu's termination. ECF No. 1; ECF No. 32-4

at 2.  She brought claims under 42 U.S.C. Section 1981 for national-origin discrimination, hostile work environment, and retaliation.  ECF No. 1 at 30.

Defendants moved for Summary Judgment on all of Liu's claims.  ECF No. 32.  The motion is now ripe.  *See* ECF Nos. 37, 41.

**DISCUSSION**

### I.      Summary Judgment Standard

To be entitled to summary judgment, a movant must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  FED. R. CIV. P. 56. The movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense.  *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show summary judgment is inappropriate.  *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).  Nor is a mere "scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary

7

facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and it must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.    Analysis

Liu brings claims under 42 U.S.C. Section 1981 for national-origin discrimination, a hostile work environment, and retaliation.[5] The Court will address each claim in turn.

### a.    National-Origin Discrimination

Liu first claims that Defendants terminated her because of her Chinese national origin. "A plaintiff may prove" an employment discrimination case "using either direct evidence or circumstantial evidence." *Ibanez v. Texas A&M Univ. Kingsville*, 118 F.4th 677, 682 (5th Cir.

---

[5] In the employment context, courts "consider[] claims of intentional discrimination, which include racial discrimination and retaliation claims based on Title VII and 42 U.S.C. [Section] 1981, under the same rubric of analysis." *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). So the Court generally cites Title VII and Section 1981 cases interchangeably in this Order.

2024).  "Absent direct evidence of discrimination," courts apply "the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792, 802–03 (1973).  *Id.*  Liu cursorily asserts that she relies on "both direct evidence and circumstantial evidence."  ECF No. 37 at 16. But she does not explain how any of her evidence is "direct" and, instead, analyzes her claims under the *McDonnell Douglas* framework.[6]

The Court thus proceeds under *McDonnell Douglas*.[7]  "Under this three-part framework, a plaintiff must first set forth a prima facie case of discrimination."  *Morris v. Town of Indep.*, 827 F.3d 396, 400 (5th Cir. 2016) (internal citations omitted).  If they do so, "a presumption of discrimination arises and the burden of production shifts to the employer to 'articulate a legitimate non-discriminatory reason for the adverse employment action.'"  *Id.* (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015)).  If the employer provides a legitimate reason, the "inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination."  *Id.* (quoting *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004)).

To establish a prima facie case of direct discrimination, Liu must show that she:

(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group.

---

[6] To the extent Liu argues that Nieves calling her "chinglish" is "direct evidence," ECF No. 37 at 9 (arguing that "a limited number of derogatory comments" can in some cases "constitute direct or circumstantial evidence"), that is incorrect.  Workplace comments can be direct evidence of discrimination if they "prove, 'without inference or presumption, that [the relevant protected characteristic] was a basis in employment decisions' in the plaintiff's workplace."  *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015), *as revised* (Feb. 3, 2015) (emphasis omitted).  While Nieves's alleged remarks—if made—were offensive, they do not prove without inference or presumption that race was a basis for employment decisions.

[7] Plaintiff argues that the *McDonnell Douglas* framework is at odds with the relevant statutory text.  ECF No. 37 at 20–24.  Regardless of whether that is correct, this Court is bound by Fifth Circuit precedent, which is clear that the *McDonnell Douglas* framework applies in cases like this one. *See, e.g., Ibanez*, 118 F.4th at 682; *Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 521–22 (5th Cir. 2025) ("On a motion for summary judgment on a Title VII discrimination claim, courts apply the *McDonnell Douglas* burden-shifting framework.").

9

*Id.* at 400–01 (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 319–20 (5th Cir. 2014)).

Defendants argue that Liu has no evidence that she was treated less favorably than a similarly situated employee outside her protected group. The Fifth Circuit "define[s] 'similarly situated' narrowly, requiring the employees' situations to be 'nearly identical.'" *West v. City of Hou., Tex.*, 960 F.3d 736, 740 (5th Cir. 2020). But *nearly* identical is, of course, "not synonymous with 'identical.'" *Harville v. City of Hou., Miss.*, 945 F.3d 870, 875 (5th Cir. 2019). "Employees are similarly situated when they (1) 'held the same job or responsibilities,' (2) 'shared the same supervisor or had their employment status determined by the same person,' and (3) 'have essentially comparable violation histories.'" *West*, 960 F.3d at 740 (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated." *Lee*, 574 F.3d at 260.

Liu has pointed to three possible comparators: Mark Camardo, Kaiyan Jing, and Anthony Tate. *See* ECF No. 37 at 38–39. Camardo and Jing were, like Liu, statisticians who reported to Nieves. ECF No. 32-3 at 27–28. But only Liu had the title of "Global Lead Statistician," and her position was higher-level than both Camardo's and Jing's. ECF No. 32-3 at 11, 27. Further, Camardo and Jing were hired in 2019, *id.*, whereas Liu was hired in 2006, ECF No. 32-4 at 3.

Liu has not provided evidence that, despite their less senior roles and much shorter tenure, Jing and Camardo's responsibilities were comparable to her own. And there is substantial unrebutted evidence that Liu's seniority imposed additional responsibilities. For instance, many of Nieves's criticisms of Liu specifically pointed to Liu's seniority and tenure. *See* ECF No. 32-4 at 32 ("For having been with the company for more than 10 yrs and having received a recent promotion, my expectations are going to be higher."), 48–49 ("[Liu] being a more senior

10

statistician should have the ability to research and defend her proposal."), 52 ("The amount of input, supervision and decision making required from your supervisor is well beyond what is expected from a Global Lead Biostatistician."). Liu admitted that it was reasonable, given her tenure, that she would be expected to handle more work than Camardo. ECF No. 32-3 at 27. And she claims that Nieves hired Jing despite her relative inexperience because "[s]he can learn," ECF No. 37 at 86, which is additional evidence that Jing was not expected to carry the same responsibilities as Liu, at least initially.

Beyond the fact that Liu had meaningfully different responsibilities than Jing and Camardo, she also provides no evidence of their violation histories. And Jing seemingly falls within Liu's protected group. *See* ECF No. 32-3 at 26 (Liu describing Jing as "the Chinese statistician"). Camardo and Jing are thus not adequate comparators.

That leaves Tate as a possible comparator. As noted above, Hart allegedly publicly blamed Liu for Tate's failure to keep some data clean. Shortly after that incident, KCI promoted Tate and terminated Liu. ECF No. 32-3 at 21. But Liu has not pointed to any evidence that she and Tate had similar responsibilities. To the contrary, Tate was a Senior Manager, which was a position comparable to Nieves's. ECF No. 32-3 at 22. He was also in the clinical operations group, which had a different function than Liu's group. *Id.* Liu has provided no evidence to suggest that, despite these differences, her job or responsibilities were meaningfully comparable to Tate's. So even assuming Tate was "incompetent," as Liu conclusorily claims, he is not similarly situated to Liu for purposes of establishing a direct discrimination claim.

Because Liu has failed to provide sufficient evidence to create a fact issue on her prima facie case, her discriminatory termination claim must be dismissed.

11

b. Hostile Work Environment

*1. In General*

To make out a hostile work environment claim, Liu must show that:

(1) [she] belonged to a protected class; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on the protected class; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Clark v. City of Alexandria*, 116 F.4th 472, 479 (5th Cir. 2024) (quoting *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 923 (5th Cir. 2022)), *cert. denied sub nom. Clark v. City of Alexandria, La.*, 145 S. Ct. 1331, 221 L. Ed. 2d 418 (2025).

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West*, 960 F.3d at 741–42 (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)).[8] "The alleged conduct must be objectively and subjectively hostile or abusive." *Id.* at 742. Whether the environment is objectively hostile or abusive depends on "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 400 (5th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "No single factor is determinative, but a single incident, if sufficiently severe, could give rise to a viable" claim, as could "a continuous pattern of much less

---

[8] Liu argues that *Muldrow v. City of St. Louis.*, 601 U.S. 346 (2024), *Hamilton v. Dallas County*, 79 F.4th 494, 503 (5th Cir. 2023), and *Abdallah v. Mesa Air Group*, 83 F.4th 1006, 1014 (5th Cir. 2023), changed this standard. ECF No. 37 at 28–29. But none of those cases involved a hostile work environment claim, and the Fifth Circuit has continued applying the standard the Court uses here since those cases were decided. *See, e.g.*, *Clark*, 116 F.4th at 479.

severe incidents." *Id.* at 479–80 (cleaned up) (quoting *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007)).

Defendants largely address each of Liu's factual claims on this issue in isolation. They say, for instance, that Nieves's use of the word "chinglish" is not sufficiently severe or pervasive. They then argue that there is no evidence that the other considerations—most notably Liu's workspace being moved and her heightened workload—had anything to do with Liu's national origin.

But "[a] hostile work environment claim is composed of a series of separate acts that *collectively* constitute one unlawful employment practice." *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) (emphasis added). And, again, whether the environment is objectively hostile depends on "all the circumstances." *Johnson*, 7 F.4th at 400.

Taken in the light most favorable to Liu, the relevant circumstances are as follows. On at least two occasions, Nieves used a pejorative, national-origin-based word—"chinglish"—in reference to Liu. She did so in anger and in a manner that drove Liu to tears on one occasion and left her embarrassed on another. ECF No. 32-3 at 15, 19. Other people in the office also used the word "chinglish" in reference to Liu, and "all of them," including Hart and Nieves, were "aware of that." ECF No. 32-3 at 24–25. Nieves also repeatedly said she could not understand Liu, in a way that was "looking down" and made Liu feel "very shameful." ECF No. 32-3 at 19.

Liu was moved to a "hallway desk" in a noisy location, while her senior cubicle was given to an entry-level, white coworker. ECF No. 32-3 at 13–15, 19. Liu had a higher workload than her peers, and Nieves delegated much her own work to Liu. ECF No. 32-3 at 27. "[I]n the context of [the] verbal harassment" described above, a reasonable juror could "infer[] that these actions were likewise motivated by" national-origin-based animus. *Johnson*, 7 F.4th at 403.

In *Johnson v. PRIDE Industries*, the Fifth Circuit found a fact issue regarding whether harassment was sufficiently severe or pervasive to support a hostile work environment claim. *Id.* at 400–04. There, as here, there was evidence that coworkers had used racial epithets against the plaintiff on multiple occasions. *Id.* at 403–04. There was also evidence that a coworker had used "terms that could reasonably be interpreted as racially pejorative depending on context-specific factors." *Id.* Comparably, one could reasonably interpret Nieves's comments about not being able to understand Liu as pejorative regarding Liu's national origin, depending on context. *See* ECF No. 32-3 at 19 (Liu noting that other coworkers had said they could not understand her, in ways that were not discriminatory but that Nieves's comments were "discrimination" and "looking down on" and made Liu feel "very shameful"). Finally, in *Johnson* a coworker assigned the plaintiff less favorable work tasks and hid the plaintiff's promotion-related paperwork. *See id.* at 400–04. Liu has provided evidence of conduct that similarly worsened her working conditions—she was forced to move to a worse working space and was given extra work.

Defendants do not contest that Liu has created a fact issue regarding the other elements of her hostile work environment claim.

### 2. Ellerth/Faragher Defense

Defendants do, however, argue that they are entitled to summary judgment based on an affirmative defense established in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998). Under this defense, an employer is not vicariously liable for a supervisor's harassment if the employer proves: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Faragher*, 524 U.S. at 807.[9]  Although this defense arose in sexual harassment cases, it also applies to harassment claims based on other protected characteristics.[10]  "To succeed on summary judgment in reliance on an affirmative defense, the moving party must establish beyond peradventure all of the essential elements of the defense to warrant judgment in its favor."  *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023) (cleaned up) (quoting *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 683 (5th Cir. 2020)).

"An employer can satisfy the first prong of the *Ellerth/Faragher* defense by implementing suitable institutional policies and educational programs regarding . . . harassment."  *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 462–63 (5th Cir. 2013).  "Where the plaintiff admits that he or she was on notice of a policy and complaint procedure and the court determines that the policy was reasonable," the first prong is satisfied.  *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 210 (5th Cir. 2016).  But "[n]ot every policy eliminates liability; generic policies that offer no specific complaint procedure may be insufficient."  *Boh Bros.*, 731 F.3d at 463.

Defendants' evidence of its anti-discrimination policy is uncontroverted.  The employee handbook forbids discrimination and harassment based on several characteristics, including national origin.  ECF No. 32-4 at 9–10.  It makes clear that the policy applies "to all areas of

---

[9] Plaintiff notes that the *Ellerth*/*Faragher* defense is not available "when the supervisor's harassment culminates in a tangible employment action."  *Faragher*, 524 U.S. at 808.  But Liu does not explain how her harassment claim is premised on a tangible employment action.  She does not, for example, allege "quid pro quo" harassment, which is the context in which the "tangible employment action" exception typically applies.  *See Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000).  And her claim that *is* premised on a tangible employment action—her termination-based claim—fails for the reasons outlined above.

[10] *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 593 (5th Cir. 1998) ("[I]t appears that the Court [in *Ellerth* and *Faragher*] intended to apply the[] same agency principles [articulated there] to all vicarious liability inquiries under Title VII for acts by supervisors."), *reh'g en banc granted, opinion vacated sub nom. Williams v. Wal-Mart Stores, Inc.*, 169 F.3d 215 (5th Cir. 1999), and *opinion reinstated in relevant part on reh'g sub nom. Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999); *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999) (collecting cases for the proposition that "[a]lthough *Ellerth* and *Faragher* dealt with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment").

employment," including company-sponsored recreational and social activities. ECF No. 32-4 at 10. An employee may address concerns with their manager or with "Any Human Resources Business Partner, Legal, or Compliance representative." ECF No. 32-4 at 11. Employees have access to "a list of contact details, telephone numbers and web addresses that [they] can use to make a report." *Id.* They can also make a report through an anonymous hotline available "24 hours a day, 7 days a week." *Id.*; ECF No. 32-3 at 7. And "[a]ll employees have a duty to report any suspected violation promptly." ECF No. 32-4 at 11. Liu does not contest that she was aware of and understood these policies. *See* ECF No. 32-3 at 7. She also does not contest that they are reasonable. *See id*; ECF No. 37.

Instead, she argues that "she made contemporaneous objections . . . to her treatment during the PIP process and that she reiterated those concerns in her pre and post-termination complaints." ECF No. 37 at 10–11. But, as discussed below, Liu's complaints were "devoid of either direct or implied reports of . . . harassment." *Casiano*, 213 F.3d at 286. So "[she] did not effectively avail [her]self of" the relevant procedures. *Id.*

Because Defendants have established both elements of the *Faragher*/*Ellerth* defense "beyond peradventure," *Wallace*, 57 F.4th at 223, summary judgment in their favor is appropriate on Liu's hostile work environment claim.

c.   Retaliation

Because Liu's retaliation claim is based on circumstantial evidence, the *McDonnell Douglas* framework applies. *Ayorinde v. Team Indus. Servs. Inc.*, 121 F.4th 500, 508 (5th Cir. 2024). To make out a prima facie case of retaliation, a plaintiff must provide evidence that (1) she "engaged in a protected activity;" (2) she "suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Id.* (quoting

16

*Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (cleaned up)). "A protected activity is either (1) opposing . . . discrimination [based on a protected characteristic] or (2) participating" in certain discrimination-related investigations, proceedings, or hearings. *Yarbrough v. SlashSupport, Inc.*, 152 F.4th 658, 667 (5th Cir. 2025). "[T]he protected activity 'must relate to discriminatory practices based on race, color, religion, sex, or national origin.'" *Faulk v. Owens Corning Roofing & Asphalt, L.L.C.*, No. 25-10356, 2025 WL 3678430, at *5 (5th Cir. Dec. 18, 2025) (quoting *Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 327 (5th Cir. 2017) (collecting cases)).

Liu argues that the following are "protected activity": (1) her written disagreement with the updated PIP and (2) her assertions that Nieves erroneously attributed a critical survey response to Liu and retaliated for that reason. ECF No. 37 at 36.

Neither of those complaints referred to discrimination based on a protected characteristic. *See* ECF No. 32-4 at 59–62, 66–78. Liu's disagreements with the updated PIP were about "the contents of the document"—that is, the PIP said she had not meaningfully improved, but she thought she had. *See* ECF No. 32-4 at 59–62. The other complaints—even assuming they could support a retaliation claim despite having been submitted after Liu's termination—similarly did not mention national origin, race, or any other protected characteristic. *See* ECF No. 32-4 at 66–78. Liu admitted that she did not make any written complaints about discrimination based on her national origin. ECF No. 32-3 at 6, 8.

Liu's declaration cursorily claims that she "verbally complain[ed] to management about discriminatory treatment." ECF No. 37 at 57. But even assuming that statement is competent summary judgment evidence—which Defendants contest, ECF No. 44 at 6—it is nothing more

than an "[u]nsubstantiated assertion[]." *Brown*, 337 F.3d at 541.  So it is "not sufficient to defeat a motion for summary judgment." *Id.*

### CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 32) is **GRANTED**, and this case is **DISMISSED.**

A final judgment will issue separately.

It is so **ORDERED**.

**SIGNED** this 9th day of February, 2026.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE